**UNITED STATES of America**

v.

**Walter Lefight CHURCH, Defendant.**

**No. 1:00CR00104.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 19, 2002.

Thomas J. Bondurant, Jr., Anthony P. Giorno, Office of the United States Attorney, Roanoke, VA, for plaintiff.

James C. Turk, Jr., Stone, Harrison & Turk, P.C., Beverly M. Davis, Davis, Davis & Davis, Radford, VA, for defendant.

## OPINION AND ORDER

JONES, District Judge.

The defendant, facing a trial in this court in which the government seeks the death penalty, argues in accord with a recent New York federal decision that to sentence him to death would violate due process because of the purported unreliability of the guilt process leading to the death penalty. I respectfully disagree with the case relied upon by the defendant and reject his effort to strike the death penalty as unconstitutional.

Walter Lefight "Pete" Church is accused by the government with participating in the 1989 shotgun murders of three members of a Pocahontas, Virginia, family, for the alleged purpose of silencing the husband of the family from informing on a local drug ring. His co-defendant, Sam Ealy, has already been tried and found guilty, but was spared the death penalty by the jury. In advance of Church's trial, his counsel has filed on his behalf a motion requesting the court to preclude any possibility of the death penalty in his case for the reasons set forth in the recent opinion of Judge Rakoff of the Southern District of New York in *United States v. Quinones*, decided on July 1, 2002.[1]

Judge Rakoff reasoned that particularly because a number of death row inmates have been exonerated by the recent development of DNA testing, it has been demonstrated that "traditional trial methods and appellate review"[2] are unable to prevent executions of innocent persons. According to Judge Rakoff, because of the inherent unreliability of determining the guilt of a criminal defendant, and since the death penalty is irreversible, there is an "undue risk"[3] that innocent persons will

1. 205 F.Supp.2d 256 (S.D.N.Y.2002). Judge Rakoff previewed his decision in an earlier opinion on April 25, 2002, *see United States v. Quinones*, 196 F.Supp.2d 416 (S.D.N.Y.), but gave the government additional time to brief the issues before issuing his final opinion.

2. 205 F.Supp.2d at 264.

3. 196 F.Supp.2d at 418.

be denied the ability to eventually prove that innocence—resulting in a violation of the Fifth Amendment's Due Process Clause.[4]

Judge Rakoff relied heavily on a recent study by law professor James S. Liebman and his colleagues of appeals in capital cases between 1973 and 1995 in which it was found that " 'the overall rate of prejudicial error in the American capital punishment system' is a remarkable 68%." [5] Because of a system that produces such mistakes, Judge Rakoff concluded, there can be no constitutional reliance on death as a permissible punishment.[6]

Constitutional challenges to the death penalty have usually been based on the prohibition against cruel and unusual punishments found in the Eighth Amendment.[7] For example, the Supreme Court recently held in *Atkins v. Virginia*[8] that the execution of a mentally retarded criminal is prohibited by the Eighth Amendment, because a "national consensus has developed against [such executions]" [9] thus

informing the Court of " 'the evolving standards of decency that mark the progress of a maturing society.' " [10]

Of course, it is not contended here that the Eighth Amendment invariably forbids capital punishment. That position has been precluded by Supreme Court decisions.[11] I believe that the present due process argument is similarly answered by binding Supreme Court authority.

In *Herrera v. Collins*[12] a state prisoner sentenced to die claimed, some eight years after his conviction, that he had newly discovered evidence of his innocence and petitioned the federal court for habeas corpus relief. The prisoner contended that it would be a violation of due process for the state to execute him if he was in fact innocent of the murders of which he had been convicted. The Court noted that such an argument has "elemental appeal" since "the central purpose of any system of criminal justice is to convict the guilty and free the innocent." [13] Nevertheless, the

4. "No person shall ... be deprived of life, liberty, or property, without due process of law ...." U.S. Const. amend. V.

5. 196 F.Supp.2d at 418 (quoting James S. Liebman, et al., *A Broken System: Error Rates in Capital Cases, 1973–1995* (2000) at ii.).

6. *See* 205 F.Supp.2d at 268. Judge Rakoff declared unconstitutional the Federal Death Penalty Act, 18 U.S.C.A. §§ 3591–3598 (West 2000), while the government seeks the death penalty in this case against Church under the provisions of a separate death penalty statute, 21 U.S.C.A. § 848 (West 1999), relating to murders committed during certain drug trafficking crimes. I have previously held that the Ex Post Facto Clause of the Constitution bars the death penalty against Church under the Federal Death Penalty Act, since his alleged offenses occurred at a time during which that Act had been declared invalid by the Supreme Court. *See United States v. Church*, 151 F.Supp.2d 715, 721 (W.D.Va. 2001). Nevertheless, the principles of Judge

Rakoff's decision apply equally to both death penalty provisions.

7. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

8. —— U.S. ——, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

9. *Id.* 122 S.Ct. at 2249.

10. *Id.* at 2247 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

11. *See McCleskey v. Kemp*, 481 U.S. 279, 300–302, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 169, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

12. 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

13. *Id.* at 398, 113 S.Ct. 853.

Court refused relief, noting that the prisoner had not shown that he had been denied any constitutional right by the state during the course of its prosecution, and observing that " '[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.' " [14]

In *Herrera* the state prisoner had received all of the protections guaranteed by the Constitution and the Court held that he thus had no "freestanding claim[ ] of actual innocence." [15] The fact that it was a death case made no difference, since "[i]t would be a rather strange jurisprudence, in these circumstances, which held that under our Constitution he could not be executed, but that he could spend the rest of his life in prison." [16]

The Supreme Court's decision in *Herrera* thus forecloses the argument that the inherent fallibility of the criminal justice system supports a due process attack on the death penalty. As the Court stated, "[i]t is an unalterable fact that our judicial system, like the human beings who administer it, is fallible." [17] That is why, the Court noted, executive clemency has been used throughout our history to right the wrongs inherent in the criminal process.[18]

Moreover, even assuming that the "error rate" in capital cases is as claimed in the study relied upon by Judge Rakoff, the issue before me is not the reliability of *state* death prosecutions, but those in the federal courts. According to the government, since 1988, when the current federal death penalty took effect, thirty-one federal defendants have been sentenced to death. None of these persons have had their convictions reversed; five have had their sentences set aside for reasons unrelated to their guilt or innocence, and of those the government elected not to reseek the death penalty in two cases. One defendant had his death sentence commuted to life imprisonment. Only two federal capital defendants have actually been executed—Timothy McVeigh, the Oklahoma City bomber, and Juan Garza, a murderer and drug kingpin. The federal experience with death penalty cases certainly does not support an argument that the federal court system is likely to convict the truly innocent.

There are certainly strong reasons to consider abolishing the death penalty in America. Aside from moral or religious grounds for its abolition, there is no clear evidence that the death penalty deters crime; it may be imposed disproportionately on minorities and the poor; the likelihood of execution may depend more on the random fact of geography rather than the nature of the crime; and death prosecutions are staggeringly expensive to the taxpayers. Doubtless, these reasons are why many countries, including those of the European Union, have abolished the death penalty. But its abolition in our country ought to be a question for our elected leaders to decide, rather then unelected and life-tenured federal judges.

After having recently spent several weeks in the companion case to this one individually interviewing in voir dire nearly two hundred prospective jurors on their attitudes toward the death penalty, I am convinced that our fellow citizens are largely conflicted about the death penalty.

---

14.  *Id.* at 399, 113 S.Ct. 853 (quoting *Patterson v. New York,* 432 U.S. 197, 208, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).

15.  *Id.* at 405, 113 S.Ct. 853.

16.  *Id.*

17.  *Id.* at 415, 113 S.Ct. 853.

18.  *See id.*

Many favor it in principle in the appropriate case, but are concerned about it in practice. That is why death penalty moratoriums have become a viable political issue. For the same reasons that Judge Rakoff in his decision found the chance of an innocent person being executed intolerable, some legislators and other elected officials are finding it easier to espouse abolition of the death penalty, while keeping the political support that comes from standing firm against crime.[19] I am convinced that our citizens are fully capable of debating and ultimately deciding whether the death penalty should remain as part of our system of criminal justice. It does no good and indeed does positive harm to our democracy for judges to legislate against the death penalty in the guise of constitutional interpretation.

For the foregoing reasons, it is ORDERED that the defendant's motion (Doc. No. 545) is denied.

---

**19.** *See* Austin Sarat, *The "New Abolitionism" and the Possibilities of Legislative Action: The* *New Hampshire Experience,* 63 Ohio St. L.J. 343, 348 (2002).